2000-NMCA-021

999 P.2d 1031

**PRODUCTION CREDIT ASSOCIATION OF EASTERN NEW MEXICO,** Appellant,

v.

**TAXATION AND REVENUE DEPARTMENT OF the STATE OF NEW MEXICO,** Appellee.

**No. 20,078.**

Court of Appeals of New Mexico.

Feb. 1, 2000.

Certiorari Denied, No. 26,211, March 13, 2000.

Curtis W. Schwartz, Timothy R. Van Valen, Modrall, Sperling, Roehl, Harris & Sisk, P.A., Santa Fe, for Appellant.

Patricia A. Madrid, Attorney General, David C. Iglesias, Chief Counsel, Monica M. Ontiveros, Special Assistant Attorney General, Taxation and Revenue Department, Santa Fe, Frank D. Katz, Special Assistant Attorney General, Santa Fe, NM, for Appellee.

*OPINION*

PICKARD, Chief Judge.

{1} Production Credit Association of Eastern New Mexico (PCA) filed a claim for refund of New Mexico corporate income and franchise taxes for the 1992–1996 tax years with the New Mexico Taxation and Revenue Department (Department). PCA claimed it was entitled to a refund because (1) Congress declared production credit associations like PCA to be federal instrumentalities, (2) federal instrumentalities are inherently immune from state taxation under the Supremacy Clause of the United States Constitution unless Congress expressly waives their immunity, and (3) Congress did not expressly waive PCA's immunity for the tax years at issue. The Department's internal hearing officer denied PCA's claim on the grounds that (1) Congress expressly waived the tax immunity enjoyed by privately owned production credit associations in the Farm Credit Act of 1933 and (2) Congress did not intend to confer upon these associations an implied immunity from state taxation by passing the Farm Credit Amendments Act of 1985, which repealed the express tax immunity waiver that had been in place since Congress passed the Farm Credit Act of 1933. We agree with the hearing officer and affirm his decision for the reasons stated below.

## BACKGROUND AND PROCEDURAL HISTORY

{2} In 1916, Congress passed the Federal Farm Loan Act (1916 Act). *See* Pub.L. No. 64–158, §§ 4, 12, 39 Stat. 360, 362–64, 370–72 (1916). The 1916 Act established the Farm Credit System (System). *See id.* The System was created for the purpose of providing secured credit to farmers and ranchers at reasonable cost. *See* S.Rep. No. 144, at 2–3 (1916). The System, which then consisted of twelve regional land banks, could make loans only to farmers and ranchers. *See* Pub.L. No. 64–158, §§ 4, 12, 39 Stat. at 362–64, 370–72. The loans had to be secured by first mortgages on farm or ranch property. *See id.* Seven years later, Congress created federal intermediate credit banks for the purpose of making farm and ranch loans that could be secured by something other than first mortgages on farm or ranch lands. *See* Pub.L. No. 67–503, § 202(a)(3), 42 Stat. 1454, 1455 (1923).

{3} In 1933, Congress, in response to the Great Depression, passed the Farm Credit

Act of 1933 (1933 Act). *See* Pub.L. No. 73–75, § 20, 48 Stat. 257, 259. The 1933 Act established production credit associations (credit associations) like PCA for the purpose of providing short- and intermediate-term loans to farmers and ranchers. *See* S.Rep. No. 124, at 2 (1933). The United States initially capitalized and owned all the stock in the credit associations. *See id.* Pursuant to statute, the credit associations were exempt from state taxation while the federal government owned stock in them. *See* Pub.L. No. 73–75, § 63, 48 Stat. at 267. However, pursuant to the same statute, once the federal government's stock was retired, the 1933 Act expressly waived the credit associations' immunity from state income and franchise taxes. *See id.* Congress hoped that the United States' ownership interest in the credit associations would come to an end at some point and that the credit associations would eventually become locally owned by their borrowers. *See* S.Rep. No. 124, at 2.

{4} In order to fulfill its hope, Congress required farmers and ranchers to purchase stock in the credit association from which they were borrowing in an amount equal to 10% of the unpaid principal balance of their respective loans. As part of the loans, sufficient proceeds were generally advanced to the borrowers to purchase the required stock. Congress's hope was realized in the 1960s, by which time the credit associations were owned entirely by the farmers and ranchers who had borrowed money from them. The federal government no longer had an ownership interest in any credit association, nor has it since.

{5} The Farm Credit Administration, which is the federal body responsible for regulating and examining the entities within the System, authorized the incorporation of PCA as a credit association in 1934. As an incorporated and federally chartered credit association, PCA is a statutorily declared federal instrumentality. *See* 12 U.S.C. § 2071(a), (b)(7), § 2077 (1994). PCA's corporate purpose, like that of all other credit associations, is to exercise the powers granted to it by Congress under the 1933 Act as it existed or as it has been amended. Among other things, PCA loans money for periods of ten years or less; does not lend to the general public, but lends only to qualified ranchers or farmers; is not a depository bank; and has no deposit insurance.

{6} In 1971, Congress passed the Farm Credit Act of 1971 (1971 Act). *See* Pub.L. No. 92–181, § 2.17, 85 Stat. 583, 602 (1971). The 1971 Act made a number of significant changes to the 1933 Act, but retained the tax provisions contained within the 1933 Act. *See id.* The tax provisions in the 1971 Act provided in relevant part:

> Each production credit association and its obligations are instrumentalities of the United States. . . . *Such associations, their property, their franchises, capital, reserves, surplus, and other funds, and their income shall be exempt from all taxation now or hereafter imposed by the United States or by any State, territorial, or local taxing authority. . . . The exemption provided in the preceding sentence shall apply only for any year or part thereof in which stock in the production credit association is held by the Governor of the Farm Credit Administration.*

*Id.* (emphasis added).

{7} In 1985, Congress passed the Farm Credit Amendments Act of 1985 (1985 Act). *See* Pub.L. No. 99–205, § 205, 99 Stat. 1678 (1985). The 1985 Act, among other things, repealed the highlighted sentences in the taxation section of the 1971 Act quoted above. *See id.,* § 205(d)(16), 99 Stat. at 1705. As a result, the limited waiver of immunity from state taxation that had been expressly worded in both the 1933 Act and the 1971 Act was not explicitly mentioned in the 1985 Act.

{8} PCA timely filed New Mexico corporate income tax returns and timely paid New Mexico corporate income taxes for the tax years 1992, 1993, 1994, 1995, and 1996. PCA timely submitted claims for refund of all New Mexico income taxes paid for tax years 1992–1996 in the total amount of $343,782. PCA based its claims for refund upon its understanding that, as a federal instrumentality, it is immune from state taxation pursuant to the Supremacy Clause of the Constitution. After the Department denied its claims, PCA timely filed a protest. In this consolidated

proceeding, PCA seeks all amounts claimed as refunds for its 1992–1996 tax years, plus interest thereon, as provided in NMSA 1978, § 7–1–68 (1996).

## STANDARD OF REVIEW

{9} The issue presented for our review is whether Congress intended to confer tax immunity upon privately owned production credit associations by passing the 1985 Act, which repealed the express tax immunity waiver contained in both the 1933 Act and the 1971 Act. The parties submitted this issue to the Department's internal hearing officer for consideration upon stipulated facts. Accordingly, we are presented with an issue of law, which we must review *de novo. See State v. Ogden,* 118 N.M. 234, 240, 880 P.2d 845, 851 (1994) (ruling that issues of law are reviewed *de novo* ); *State v. Romero,* 119 N.M. 195, 197, 889 P.2d 230, 232 (Ct.App. 1994) (ruling that interpretation of statute is an issue of law). In conducting our review, we will not defer to the hearing officer's decision "because it is the function of the courts to interpret the law." *Morningstar Water Users Ass'n v. New Mexico Public Utility Comm'n,* 120 N.M. 579, 583, 904 P.2d 28, 32 (1995).

## DISCUSSION

## I. FEDERAL INSTRUMENTALITY

{10} PCA claims it is an instrumentality of the federal government. We agree. The 1933 Act expressly stated that credit associations like PCA are federal instrumentalities. *See* Pub.L. No. 73–75; § 63, 48 Stat. at 267. Although Congress significantly altered the 1933 Act when it passed the 1971 Act, Congress nevertheless maintained the classification of credit associations as instrumentalities of the federal government in the 1971 Act. *See* 12 U.S.C. § 2071(a) ("Each production credit association shall continue as a Federally chartered instrumentality of the United States."); 12 U.S.C. § 2077 ("Each production credit association and its obligations are instrumentalities of the United States...."). These provisions were not disturbed when Congress passed the 1985 Act, and they remain in effect to this day. In view of the fact that PCA is a federal instru-

mentality, we next address the consequences that result from PCA's status.

## II. IMMUNITY FROM STATE TAXATION

### A. *Inherent Immunity*

{11} PCA claims credit associations, as federal instrumentalities, are inherently immune from state taxation under the Supremacy Clause of the United States Constitution unless Congress expressly waives that immunity. The Department counters that PCA's focus on constitutional immunity is misplaced because

Congress did not rely on *constitutional* immunity in the original or subsequent Farm Credit Acts or enact a waiver of constitutional immunity. Rather Congress enacted both an explicit *statutory* immunity from state (and federal) taxes and an express statutory exception to that immunity for PCAs no longer federally owned.

In light of its contention, the Department intimates that credit associations like PCA would be subject to state taxation—even though Congress has deemed them to be federal instrumentalities—if not for Congress expressly granting them immunity from state taxation. We disagree with the Department. The Supremacy Clause inherently bars state taxation of federal instrumentalities, *see McCulloch v. Maryland,* 4 Wheat. 316, 17 U.S. 316, 435–36, 4 L.Ed. 579 (1819), unless taxation is "authorized by Congress," *see First Agric. Nat'l Bank v. State Tax Comm'n,* 392 U.S. 339, 340, 88 S.Ct. 2173, 20 L.Ed.2d 1138 (1968).

{12} As PCA claims, the now time-honored rule set forth in *McCulloch* has been followed by an unbroken line of Supreme Court decisions. *See, e.g., United States v. Tax Comm'n,* 421 U.S. 599, 605, 95 S.Ct. 1872, 44 L.Ed.2d 404 (1975) (holding that state could not impose tax upon sales to military base); *Department of Employment v. United States,* 385 U.S. 355, 358–59, 87 S.Ct. 464, 17 L.Ed.2d 414 (1966) (holding that Red Cross as a federal instrumentality is immune from state taxation); *Federal Land Bank v. Board of County Comm'rs,* 368 U.S. 146, 149, 82 S.Ct. 282, 7 L.Ed.2d 199 (1961) (stating that

"a federal instrumentality is not subject to the plenary power of the States to tax"); *United States v. County of Allegheny*, 322 U.S. 174, 176, 64 S.Ct. 908, 88 L.Ed. 1209 (1944) ("[S]ince 1819, when Chief Justice Marshall in the *McCulloch* case expounded the principle that ... instrumentalities of the Federated Government are immune from taxation by [the States], this Court never has departed from that basic doctrine or wavered in its application."); *Osborn v. Bank of the United States*, 9 Wheat. 738, 22 U.S. 738, 865, 6 L.Ed. 204 (1824) (ruling that congressional silence as to immunity from state taxation of federal instrumentality did not change the fact that it was immune from state taxation); *see also Peisker v. Unemployment Comp. Comm'n*, 45 N.M. 307, 309, 115 P.2d 62, 63 (1941) (stating rule of *McCulloch*). In view of the fact that PCA is inherently immune from state taxation, we must next address whether Congress purposely waived its immunity and whether further legislation was intended to be a return to inherent immunity.

### B. *Congressional Waiver*

{13} The Department's internal hearing officer concluded, and PCA concedes, that Congress expressly waived the inherent tax immunity enjoyed by privately owned credit associations in both the 1933 Act and the 1971 Act. The hearing officer also concluded that Congress did not intend, by passing the 1985 Act, to confer upon these credit associations an implied immunity from state income and franchise taxes. In order to draw this conclusion, the hearing officer looked to the entire legislative history and congressional intent underlying the 1985 Act.

{14} PCA contends the hearing officer erred by delving into legislative history and congressional intent because the 1985 Act expressly repealed the pre-existing waiver of tax immunity contained within the 1933 Act without qualification or equivocation. According to PCA, under the plain meaning rule, we must give effect to the 1985 Act's language and refrain from further interpretation because its language is clear and unambiguous. *See State v. Jonathan M.*, 109

N.M. 789, 790, 791 P.2d 64, 65 (1990) (stating the plain meaning rule).

{15} PCA correctly points out that neither an administrative agency nor an appellate court can resort to legislative history or the principles of statutory construction when the statute in question is clear and unambiguous. However, PCA is mistaken in its contention that a statute that is apparently clear and unambiguous on its face is always subject to the plain meaning rule. As our Supreme Court has stated:

[C]ourts must exercise caution in applying the plain meaning rule. Its beguiling simplicity may mask a host of reasons why a statute, apparently clear and unambiguous on its face, may for one reason or another give rise to legitimate ... differences of opinion concerning the statute's meaning. In such a case, it can rarely be said that the legislation is indeed free from all ambiguity and is crystal clear in its meaning. While ... one part of the statute may appear absolutely clear and certain to the point of mathematical precision, *lurking in another part of the enactment, or even in the same section, or in the history and background of the legislation, or in an apparent conflict between the statutory wording and the overall legislative intent, there may be one or more provisions giving rise to genuine uncertainty as to what the legislature was trying to accomplish. In such a case, it is part of the essence of judicial responsibility to search for and effectuate the legislative intent—the purpose or object—underlying the statute.* See Perea [v. Baca], 94 N.M. [624,] 627, 614 P.2d [541,] 544 [ (1980) ] (courts are permitted to interpret by looking to legislative intent if there is *any doubt* as to the meaning of the words) (emphasis added); *State v. Herrera*, 86 N.M. 224, 225–26, 522 P.2d 76, 77–78 (1974) (statute construed based on perceived legislative object and purpose, rather than on literal language)....

*State ex rel. Helman v. Gallegos*, 117 N.M. 346, 353, 871 P.2d 1352, 1359 (1994) (emphasis added).

{16} As we explain below, both the history and background of the 1985 Act, and the

apparent conflict between the 1985 Act's wording and the overall legislative intent expressly set out in the 1933 and 1971 acts, give rise to genuine uncertainty, as to what Congress was trying to accomplish when it passed the 1985 Act. Consequently, we must search for and effectuate the legislative intent underlying the 1985 Act.

### 1. *1933 Act and 1971 Act*

■ {17} We first consider the legislative acts that preceded the 1985 Act. In the 1933 Act, Congress expressly stated that it intended for credit associations to lose their immunity from state taxation when the federal government no longer owned stock in them. *See* Pub.L. No. 73–75, § 63, 48 Stat. at 267. In the 1971 Act, Congress continued to evince that intention. *See* Pub.L. No. 92–181, § 2.17, 85 Stat. at 602. In particular, Congress continued to expressly limit the tax immunity enjoyed by credit associations by stating

> [production credit] associations, their property, their franchises, capital, reserves, surplus, and other funds, and their income shall be exempt from all taxation now or hereafter imposed by the United States or any State, territorial, or local taxing authority.... *The exemption provided in the preceding sentence shall apply only for any year or part thereof in which stock in the production credit association is held by the Governor of the Farm Credit Administration.*

*See id.* (emphasis added). In view of the express language contained in both the 1933 Act and the 1971 Act, we hold that Congress intended to subject privately owned credit associations to state income and franchise taxes prior to passing the 1985 Act.

### 2. *1985 Act*

■ {18} In the 1985 Act, Congress repealed the two sentences in the taxation section of the 1971 Act that expressly exempted credit associations from state taxation until the federal government no longer held an ownership interest in them. *See* Pub.L. No. 99–205, § 205(d)(16), 99 Stat. at 1705. As a consequence, the express waiver that had appeared in both the 1933 Act and the 1971

Act no longer appeared in the 1985 Act. According to the Department, that result leaves us to consider (1) whether the deletion was intended simply to omit unnecessary language, having no substantive effect, since the waiver exception had completely swallowed the qualified exemption or (2) whether Congress intended a complete about-face on the issue of state taxation of credit associations. As we discuss below, we believe Congress simply intended to omit unnecessary language.

#### a) *Surplus Language*

{19} As we stated above, Congress intended to subject privately owned credit associations to state income and franchise taxes under both the 1933 Act and the 1971 Act. Indeed, Congress hoped that the federal government's ownership interest in the credit associations would come to an end at some point and that the credit associations would eventually become locally owned by their borrowers. *See* S.Rep. No. 124, at 2, Congress's hope was realized in 1968, by which time every credit association was, in fact, privately owned by the farmers and ranchers who had borrowed money from them. It would therefore have been useless, mere surplusage, for Congress to include an express waiver in the 1985 Act. By that time, every court that had had the occasion to address the taxability of privately owned credit associations honored Congress's intent and held in the tax collector's favor. *See, e.g., Woodland Prod. Credit Ass'n v. Franchise Tax Bd.*, 225 Cal.App.2d 293, 37 Cal.Rptr. 231, 233 (1964) ("It is difficult ... to avoid the belief that, once these associations became farmer-owned, Congress meant to place them on a tax parity with comparable, privately held entities."); *Montana Livestock Prod. Credit Ass'n v. State*, 143 Mont. 578, 393 P.2d 50, 53 (1964); *Columbus Prod. Credit Ass'n v. Bowers*, 173 Ohio St. 97, 180 N.E.2d 1, 2 (1962); *Baker Prod. Credit Ass'n v. State Tax Comm'n*, 245 Or. 352, 421 P.2d 984, 985 (1966) (en banc).

#### b) *Technical Changes*

{20} In view of the fact that, by 1985, Congress had evinced its intention to subject

privately owned credit associations to state taxation for well over 50 years and that the courts had uniformly supported Congress's power to do so, it would have been a major substantive change in legislative direction to suspend state taxation of such associations. As the Department argues, if Congress intended to make a major substantive change in the way credit associations were taxed by passing the 1985 Act, "one would expect that there would be some mention of the change in the legislative history." And yet there is none. To the contrary, the House Report commentary on Section 205 of the 1985 Act states:

Section 205 contains numerous *technical and conforming amendments to the provisions of the Farm Credit Act of 1971 affected by changes in the basic powers, duties and authorities of the Farm Credit Administration.* This section would amend the appropriate provisions of the Act to delete the requirement for specific approval by the Farm Credit Administration of certain activities of the banks and associations and by deleting the general authority of the Farm Credit Administration to supervise System institutions. These changes are consistent with one of the major purposes of the legislation which is to establish the Farm Credit Administration as an arms length regulator of the System institutions and to take it out of certain activities of the System which would involve it in management discretion of such institutions.

H.R.Rep. No. 425, at 28 (1985), U.S.Code Cong. & Admin. News 1985, at 2587, 2615.

{21} Thus, neither the 1985 Act nor its written legislative history indicates any intention by Congress to purposefully remove the long-standing waiver of immunity from privately owned credit associations. We agree with the Department that "[i]t is extraordinarily unlikely that Congress would have intended such a marked change in the tax status of PCAs without a single mention of such change in any of the legislative history."

### c) *Return to Inherent Immunity*

{22} PCA's retort to this legislative history and congressional intent analysis is that "the Constitution provides immunity unless waived; and it is clear that the immunity was not waived for the period of PCA's claim for refund." PCA intimates that in light of *McCulloch,* Congress did not and could not legislate out of existence the credit associations' inherent immunity from state taxation under the Supremacy Clause without some current express language doing so. We disagree.

{23} In *McCulloch,* the Supreme Court determined that states lack the power to tax federal instrumentalities due to the Supremacy Clause. *See McCulloch,* 17 U.S.(4 Wheat.) at 435–36. Thus, when Congress is completely silent on state taxation of a federal instrumentality, the Supremacy Clause would bar state taxation. *See Osborn,* 22 U.S.(9 Wheat.) at 865. However, when Congress expresses its intention to subject a federal instrumentality to state taxation, it is obvious that the Supremacy Clause would permit taxation. *See First Agric. Nat'l Bank,* 392 U.S. at 340, 88 S.Ct. 2173 (ruling that national banks, as federal instrumentalities, are only subject to state taxation to the extent authorized by Congress).

{24} In the case at bar, Congress expressly waived the state tax immunity of privately owned credit associations since credit associations were first created by the 1933 Act. Although the language waiving the exemption from state taxation was dropped in the 1985 Act, our analysis of the 1985 Act's entire legislative history, both that in the Congressional Record and that shown by the historical background of the legislation, leads us to the conclusion that Congress did not intend to confer tax immunity upon privately owned credit associations in the 1985 Act. We therefore hold that PCA is not immune from the imposition of corporate income tax under the Supremacy Clause of the United States Constitution.

{25} In crafting this holding, we acknowledge that the other courts that have considered the issue now before us for appellate review have ruled that, under the 1985 Act, all credit associations are immune from state taxation. *See, e.g., Arkansas v. Farm Credit Servs.,* 338 Ark. 322, 994 S.W.2d 453 (1999);

*Farm Credit Servs. of Mid–America v. Department of State Revenue,* 705 N.E.2d 1089 (Ind.Tax Ct.1999). These courts, without exception, have based their decisions on the well-settled rule that federal instrumentalities retain their inherent immunity from state taxation in the face of Congressional silence. *See Arkansas,* 994 S.W.2d at 455 ("Our federal government is immune from taxation imposed by the state, unless that immunity is waived, explicitly or expressly, by a statutory waiver of that immunity."); *Farm Credit Servs. of Mid–America,* 705 N.E.2d at 1092 ("The rule that the Supremacy Clause bars state taxation of federal instrumentalities, absent congressional waiver, dates from the U.S. Supreme Court's decision in *McCulloch ....*") (footnote omitted). Due to the fact that the 1985 Act fails to expressly waive the tax immunity enjoyed by credit associations, these courts have concluded that such associations are not subject to state taxation. *See Arkansas,* 994 S.W.2d at 456 ("The current version of § 2077, with its silence on the issue [of state taxation], compels a holding of immunity ...."); *Farm Credit Servs. of Mid–America,* 705 N.E.2d at 1092 ("Because Congress has not waived ... immunity from state taxation, under the Supremacy Clause, Indiana is without power to collect the [tax] from Mid–America.").

{26} In our view, these courts' narrow and exclusive focus on the 1985 Act's language produces a logical but incorrect result. We agree with the courts that if we looked at the law only at the time when PCA was taxed, PCA would be entitled to a refund for the 1992–1996 tax years because the 1985 Act is silent on the issue of state income taxation. Our review of the issue presented on appeal, however, is not confined to a cursory or wooden analysis of the 1985 Act. *See Gallegos,* 117 N.M. at 353, 871 P.2d at 1359 (ruling that it is our responsibility to search for and effectuate the legislative intent underlying the statute in question). After examining the 1985 Act's clear and extensive legislative history, we believe, for the reasons stated above, that Congress has unequivocally evinced its unwavering intention to subject privately owned credit associations to state income taxation. In particular, we are most persuaded by the dissent in *Farm Credit*

*Services v. Arkansas,* 76 F.3d 961, 967 (8th Cir.1996) (Loken, J., dissenting), *rev'd on other grounds,* 520 U.S. 821, 117 S.Ct. 1776, 138 L.Ed.2d 34 (1997). We must give deference to that intention. *See State v. Herrera,* 86 N.M. 224, 225–26, 522 P.2d 76, 77–78 (1974) (ruling that when a legislative body's perceived legislative intent fails to coincide with a statute's wording, it is the perceived intent, and not the statute's literal language, that we must vindicate).

## CONCLUSION

{27} For the reasons stated, we affirm.

{28} **IT IS SO ORDERED.**

BUSTAMANTE and SUTIN, JJ., concur.