2002-NMCA-072

50 P.3d 554

Nicklos E. JARAMILLO and Darrell Jaramillo, Plaintiffs–Appel-lees/Cross–Appellants,

v.

Larry GONZALES and Bank of America Housing Services, a Division of Bank of America FSB, Defendants–Appel-lants/Cross–Appellees.

No. 21,180.

Court of Appeals of New Mexico.

April 9, 2002.

Certiorari Denied, No. 27,490, May 28, 2002.

John P. Burton, Rodey, Dickason, Sloan, Akin & Robb, P.A. Santa Fe, NM, for Appellants/Cross–Appellees.

*OPINION*

FRY, Judge.

{1} Plaintiffs Nicklos E. and Darrell Jaramillo filed suit against Bank of America Housing Services (Bank), which was the lien holder on a mobile home owned by Plaintiffs, when the home was damaged by water leaking from defective pipes. Plaintiffs claimed that they were entitled to revoke acceptance of the mobile home and that the Bank had engaged in unfair trade practices when it refused to acknowledge Plaintiffs' right to seek redress against it. The trial court granted Plaintiffs revocation of the sales contract; damages in the amount of $29,636 for payments made pursuant to the contract and $6,765 compensatory damages for the cost of obtaining alternative housing; $25,000 for emotional distress resulting from the Bank's breach of the duty of contractual good faith; and $5,000 to Nicklos for defamation resulting when the Bank made false reports to credit reporting agencies. The trial court also awarded attorney fees to Plaintiffs based on their Unfair Practices Act claim. The trial court allowed the Bank to offset those amounts by $15,317, which was the amount paid by Plaintiffs' insurance company for the water damage, plus accrued interest. The Bank appeals. Plaintiffs cross-appeal the award of attorney fees and the offset of insurance proceeds against the judgment. We affirm.

**BACKGROUND**

{2} In December 1989, Nicklos Jaramillo purchased a mobile home for his son, Darrell, that was delivered the following January. To finance the purchase, Nicklos executed a retail installment contract and security agreement with the seller, who then assigned the contract and security agreement to a predecessor of the Bank. The contract required the Jaramillos to maintain insurance on the mobile home. The Jaramillos consistently made the required monthly payments on the home and were current on their pay-

James A. Burke, Santa Fe, NM, for Appellees/Cross–Appellants.

ments at the time the following incident occurred.

{3} In June 1995, Darrell returned home from work one day to discover that the mobile home had flooded. He attempted to clean up the water and dry out the mobile home. He then began investigating the cause of the flooding. He learned that the seller of the mobile home had gone out of business. After numerous phone calls, he finally traced the manufacturer of his mobile home to a plant in Georgia. The Georgia plant dispatched a local repairman to determine the cause of the flooding. The repairman informed Darrell that the flooding was caused by leaks in the polybutylene used in the plumbing throughout the home and that his "problems were just beginning." The deficiencies of polybutylene are well known throughout the mobile home industry.

{4} Darrell filed a claim with his insurance company to recover for the damage the flooding caused to the mobile home and his personal effects. The insurance company settled the claim for $15,317 and issued a check payable to Darrell and the Bank. Darrell deposited the check in his own account without informing the Bank. Darrell did not use the money to repair the mobile home.

{5} In February 1996, the Jaramillos' attorney sent a letter of revocation to the Bank, stating that the flooding had caused considerable damage and had rendered the mobile home uninhabitable. The letter asserted that the Bank, as the assignee of the contract, was subject to all claims and defenses that could have been asserted against the seller. The Bank did not acknowledge the letter of revocation; instead, it sent a routine monthly billing statement showing a past due balance. The Bank followed the billing statement with a collection letter and a phone call to Nicklos. When Nicklos told the Bank that he had revoked acceptance of the mobile home and that he would not be paying on the contract, the Bank advised him of his contractual obligation and the effect of non-payment on his credit rating. The Bank continued to seek to collect on the contract and reported a delinquent debt to credit agencies. Thereafter, Nicklos was denied credit twice due to the reports made by the

Bank. In April 1996, upon the Bank's continued refusal to accept the revocation, the Jaramillos filed suit.

## DISCUSSION

*The Bank's Appeal*

### Statute of Limitations

■ {6} The Bank argues that Plaintiffs' claims relating to the defects in the mobile home are barred by the statute of limitations. Plaintiffs maintain that the Bank waived this defense by raising it only a couple of weeks before trial and long after it had filed its original answer. Plaintiffs' amended complaint stated claims for breach of express and implied warranties, revocation of acceptance, violation of the Unfair Practices Act, breach of contract for failure to acknowledge the Federal Trade Commission (FTC) holder clause in the contract, and defamation. The Bank denied the allegations in the amended complaint. Shortly before trial, the Bank moved to amend its answer, arguing that Plaintiffs' claims relating to defects in the mobile home were barred by the statute of limitations. Plaintiffs argue that the trial court erred by allowing the Bank to raise this defense so late in the course of litigation. We disagree.

{7} When Plaintiffs complained they were unfairly prejudiced by the Bank's tardy assertion of the statute of limitations defense, the trial court offered a continuance in order to allow them to prepare to meet the argument. Plaintiffs declined the offer. Therefore, we cannot say assertion of the defense prejudiced Plaintiffs. Without prejudice, there is no basis to reverse the trial court's decision allowing the Bank to raise the defense of statute of limitations. *See Sanchez v. Saylor*, 2000–NMCA–099, ¶ 30, 129 N.M. 742, 13 P.3d 960 (holding that orders allowing amendment of pleadings are reviewed for abuse of discretion and indicating that discretion will not be abused when there is no prejudice to the party opposing the amendment).

■ {8} We turn now to the merits of the statute of limitations defense. The Bank argues the applicable statute of limitations is NMSA 1978, Section 55–2–725 (1961), which is a four year statute of limitations for "[a]n

action for breach of any contract for sale." *Id.* "A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. A breach of warranty occurs when tender of delivery is made. . . ." *Id.* We review de novo whether a particular statute of limitations applies. *In re Estate of Baca,* 1999–NMCA–082, ¶ 12, 127 N.M. 535, 984 P.2d 782.

■ {9} The mobile home was delivered in January 1990. Plaintiffs filed their complaint in April 1996, more than six years later. We agree with Defendant that Section 55–2–725 appears to bar Plaintiffs' breach of warranty claims. However, although Defendant requested them, the trial court made no findings on the applicability of this statute of limitations to the warranty claims. Moreover, the trial court did not award damages for breach of warranty. Consequently, there is no basis to reverse the trial court's judgment. *See In re Estate of Heeter,* 113 N.M. 691, 695, 831 P.2d 990, 994 (Ct.App.1992) (stating that we will not correct error if it will not change the result).

■ {10} The Bank also argues the claim for revocation is barred by the same statute of limitations. Plaintiffs contend that this issue was not preserved below. They argue that the Bank asserted the statute of limitations only with regard to the breach of warranty claims. Our review of the hearing where the Bank sought permission to amend its answer to assert the statute of limitations indicates that it tied all the UCC claims together and claimed the benefit of the same statute of limitations—Section 55–2–725—with respect to all. Thus, although the Bank did not specifically argue that the revocation claim is barred by the same statute of limitations, we believe that its arguments regarding all the UCC claims and the application of the statute of limitations adequately preserved the issue. *See Quintana v. Baca,* 1999–NMCA–017, ¶ 12, 126 N.M. 679, 974 P.2d 173 (reviewing an issue that was arguably not preserved in the trial court when the general theory was discussed in the trial court, even though objection was not as specific as it could have been).

{11} We do not agree with the Bank that a claim of revocation is governed by Section 55–2–725. Although the Bank has cited two cases directly on point, *Snyder v. Boston Whaler, Inc.,* 892 F.Supp. 955, 959 (W.D.Mich.1994), and *Grus v. Patton,* 790 S.W.2d 936, 939 (Mo.Ct.App.1990), we are not impressed by the reasoning of either case. In particular, *Snyder* contained no reasoning whatsoever and simply stated the conclusion that because revocation of acceptance is based on a breach of warranty, the statute of limitations for an action to revoke is the same as one for breach of warranty. *Snyder,* 892 F.Supp. at 959. *Grus* noted the lack of case law on the issue, probably because in the cases it cited, dealing with defective automobiles, a reasonable time to discover the defect was much less than the four-year statute. *Grus,* 790 S.W.2d at 939–40. In our case, because of the hidden nature of the defect, we believe that the following rationale is most persuasive.

{12} The UCC provides two distinct buyers' remedies, each of which offers a different form of relief governed by different sections of the Code. Thus, there are remedies available for buyers who have not accepted goods or who justifiably revoke acceptance, NMSA 1978, Section 55–2–711 (1961), and remedies dealing with breach in regard to accepted goods, NMSA 1978, Section 55–2–714 (1961).

■ {13} Case law makes it clear that the remedies for breach of warranty and the remedy of revocation are different remedies that require different proofs. *See GMAC v. Anaya,* 103 N.M. 72, 74, 703 P.2d 169, 171 (1985) (explaining that the two are separate remedies treated in different sections of the UCC and which offer separate forms of relief). A breach of warranty presents an objective claim that the goods do not conform to a promise, affirmation, or description, or that they are not merchantable. In contrast, for a buyer to revoke acceptance, the goods must have a nonconformity that substantially impairs the value of the goods to the buyer. This is a subjective test, requiring the trial court to first determine the purpose for which the buyer purchased the goods and then to determine whether the nonconformity substantially impairs the buyer's ability to use the goods *for that purpose. *Griffith v.*

*Latham Motors, Inc.,* 128 Idaho 356, 913 P.2d 572, 577 (1996). Thus, breach of warranty and revocation are separate and distinct claims. They are unconnected, and one may be found without the other. *See Barry & Sewall Indus. Supply Co. v. Metal–Prep of Houston, Inc.,* 912 F.2d 252, 257 (8th Cir. 1990) (holding that revocation and a suit for damages are distinct remedies and a buyer may pursue either or both options).

{14} Further, a claim for revocation is not a breach of contract claim, but it is similar to a claim to have the contract voided. Once a buyer shows that goods have a non-conformity that substantially impairs their value to him, he may revoke his acceptance of the goods, which results in a cancellation of the contract. A buyer revoking a contract cannot seek damages for breach of contract, because the contract is void. *See Sims v. Craig,* 96 N.M. 33, 34, 627 P.2d 875, 876 (1981) (holding that where a contract is void, no damages for breach of contract are available). Because of the difference in the two theories and established law that a revocation claim is not a breach of contract claim, we hold that the statute of limitation applicable to breach of contract claims does not necessarily apply to revocation.

{15} The revocation statute sets forth its own time limitation for seeking revocation. NMSA 1978, Section 55–2–608(2) (1961) states that, "[r]evocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it." The Bank argues that even if the four-year statute of limitations does not apply, Plaintiffs did not revoke acceptance within a "reasonable time." It is a question of fact whether the time between acceptance and revocation was reasonable. *Ybarra v. Modern Trailer Sales, Inc.,* 94 N.M. 249, 250, 609 P.2d 331, 332 (1980). The determination of reasonableness should be made on a case-by-case basis. *Id.*

{16} Here, the trial court found that five years was a reasonable time in which to discover the latent defect of the plumbing. That determination is supported by the evidence that the plumbing was located behind walls and under appliances and that polybu-

tylene is highly unstable and can crack at any time. The evidence also established that after the flooding occurred, Plaintiffs spent eight months unsuccessfully attempting to find a responsible party to resolve the matter before notifying the Bank of their revocation of acceptance. This evidence supports the trial court's finding that Plaintiffs acted reasonably and did not delay in notifying the Bank. *See O'Shea v. Hatch,* 97 N.M. 409, 415, 640 P.2d 515, 521 (Ct.App.1982) (explaining that what constitutes a reasonable time within which to rescind a sale is a question of fact which differs in each case). Because the time for asserting a claim for revocation hinges on the reasonableness of the buyer's actions as determined by the trial court, and because substantial evidence supports the trial court's determination, we affirm the trial court on the limitations issue.

**Same Condition**

{17} The Bank argues next that Section 55–2–608(2) precludes revocation of acceptance because the mobile home was not in the same condition as it was at the time of sale. The UCC requires that revocation must occur "before any substantial change in condition of the goods which is not caused by their own defects." Section 55–2–608(2). The Bank contends the mobile home had been lived in for more than six years and had depreciated in value. However, the Bank did not present any evidence on depreciation. The Bank argues it was not necessary to present evidence of the exact amount of depreciation because the trial court could use its common sense to conclude that the mobile home *must* have depreciated significantly in value during the years between the sale and the time the leak developed. We disagree. If the Bank sought to counter Plaintiffs' assertion of revocation, it had to show that there was a substantial change in the condition of the mobile home. *Cf. Bailey v. Jeffries–Eaves, Inc.,* 76 N.M. 278, 289, 414 P.2d 503, 511 (1966) (providing that, where damages are based on depreciation, evidence must be presented to accurately prove the amount of depreciation). It failed to present any evidence of depreciation. Without such evidence, we cannot say that the trial court

erred in finding no substantial change in condition.

### FTC Holder Rule

{18} The Bank contends that its status as an assignee of the original sales contract limits the remedies available to Plaintiffs. It argues that the "FTC Holder Rule" permits affirmative recovery against an assignee of a contract only if the product is of little or no value when it was delivered to the buyer. According to the Bank, Plaintiffs failed to satisfy this condition because the trial court found that the mobile home had substantial value when it was delivered.

{19} Interpretation of a statute is a question of law that this Court reviews de novo. *Production Credit Assoc. v. Taxation & Revenue Dep't*, 2000–NMCA–021, ¶ 9, 128 N.M. 799, 999 P.2d 1031. The FTC Holder Rule, 16 C.F.R. § 433.2 (2002), provides in part that in connection with any sale of consumer goods or services, it is an unfair or deceptive act to take or receive a consumer credit contract that fails to contain the following provision in at least ten point, bold face, type:

### NOTICE

**ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.**

{20} In adopting this rule, the FTC abrogated the holder in due course rule in consumer credit transactions, thus preserving the consumer's claims and defenses against the creditor-assignee. The Bank argues, however, that this abrogation applies only if there is a total failure of performance or the like. This argument is based on the official Statement of Basis and Purpose published by the FTC with the rule. That statement provides in part:

> From the consumer's standpoint, this means that a consumer can (1) defend a creditor suit for payment of an obligation by raising a valid claim against the seller as a set-off, and (2) maintain an affirmative action against a creditor who has received payments for a return of monies paid on account. *The latter alternative will only be available where a seller's breach is so substantial that a court is persuaded that recission and restitution are justified.*

Preservation of Consumers' Claims and Defenses, 40 Fed.Reg. 53,506, 53,524 (Nov. 18, 1975) (emphasis added). The Bank argues that this commentary language limits the consumer's affirmative actions to those situations in which recission is the proper remedy. *See Felde v. Chrysler Credit Corp.*, 219 Ill. App.3d 530, 162 Ill.Dec. 565, 580 N.E.2d 191, 196 (1991) (concluding that "the consumer could successfully maintain an action against an assignee-creditor for any sums paid on account if a breach of warranty on the seller's part was sufficiently egregious to warrant recission of the sales contract under the applicable State law"); *Ford Motor Credit Co. v. Morgan*, 404 Mass. 537, 536 N.E.2d 587, 590 (1989) (holding that, absent a showing that they had a right to rescind the sale or that they received little or nothing of value from the dealer, the purchasers' argument that they had a right to affirmative recovery is without merit).

{21} Other courts have rejected the notion that this commentary can be used to limit the clear language of the notice required by the rule. *See Lozada v. Dale Baker Oldsmobile, Inc.*, 91 F.Supp.2d 1087, 1097 (W.D.Mich.2000) ("[N]either the text nor the commentary to the Holder Rule limits the availability of affirmative consumer claims against assignee-creditors to those who assert a right of recission under common law."); *Oxford Finance Companies v. Velez*, 807 S.W.2d 460, 463 (Tex.Ct.App.1991) ("We do not agree that the comment requires a plaintiff to obtain a finding that she has received little or nothing of value under the contract in order to recover affirmative relief from her creditor."). We agree with these

courts, and for three reasons we conclude that the Holder Rule does not limit affirmative claims to those instances where recission would be appropriate.

{22} First, the commentary is not a rule, but rather a lengthy explanation of the history and reasoning behind the rule. Second, the rule is unambiguous. It simply mandates the inclusion of specific language in consumer credit contracts. There is nothing in the rule that limits the types of claims or defenses that may be brought against the assignee. Because the rule is unambiguous, there is no basis for referring to commentary to understand the meaning of the language in the rule. *See State v. Jonathan M.,* 109 N.M. 789, 790, 791 P.2d 64, 65 (1990) (instructing that, when construing statutes that have unambiguous statutory language, we must give effect to that language and refrain from further statutory interpretation).

{23} Third, even if we were to look to the commentary to determine the meaning of the rule, we note that the commentary is not limited to the narrow statement relied on by the Bank. Rather, the commentary discusses at length the rationale for the rule and concludes that the purpose of the rule is to reallocate the costs of seller misconduct in the consumer market, "compel[ling] creditors to either absorb seller misconduct costs or return them to sellers." Preservation of Consumers' Claims and Defenses, 40 Fed. Reg. at 53,523. In discussing the measures available to the assignee, it is clear the FTC contemplated that consumer claims could be for something less than total recission and that it was for the assignee to determine which mechanisms for allocating costs of seller misconduct best served its purposes. *Lozada,* 91 F.Supp.2d at 1095. Thus, the whole purpose of the rule is to shift the liability for seller misconduct from the consumer to the seller and assignee. This purpose surely would not be promoted by limiting consumer claims to only those circumstances where recission was appropriate. Viewing the commentary as a whole, we conclude there is no basis to limit the claims that a consumer may bring against the assignee.

{24} Moreover, the FTC Guidelines for the Holder Rule state that the required notice under the rule "protect[s] the consumer's right to assert against the creditor *any* legally sufficient claim or defense against the seller. *The creditor stands in the shoes of the seller.*" Guidelines on Trade Regulation Rule Concerning Preservation of Consumers' Claims and Defenses, 41 Fed.Reg. 20,022, 20,023 (May 14, 1976) (emphasis added). These Guidelines make it clear that affirmative action for recovery, other than complete recission, is contemplated in appropriate cases.

{25} The language of the FTC Holder Rule is clear and unambiguous and contains no limitation on the kind of action or defense a consumer may raise against an assignee. Therefore, Plaintiffs were not required to show that the mobile home had little or no value when it was delivered to them before asserting their claim against the Bank.

**Unfair Practices Act**

{26} The Bank argues next that the trial court erred in concluding that the Bank's refusal to concede liability under the FTC Holder Clause violated the Unfair Practices Act (UPA), NMSA 1978, §§ 57–12–1 to –22 (1967, as amended through 1999). Whether refusal to concede liability violates the statute is a question of law which this Court reviews de novo. *See Flores v. Danfelser,* 1999–NMCA–091, ¶ 11, 127 N.M. 571, 985 P.2d 173 (holding that we review a district court's dismissal of a tort claim based upon the exclusivity provisions of the Worker's Compensation Act as a question of law), *overruled on other grounds by Delgado v. Phelps Dodge Chino, Inc.,* 2001–NMSC–034, 131 N.M. 272, 34 P.3d 1148.

{27} The Unfair Practices Act defines an unfair or deceptive trade practice as:

any false or misleading oral or written statement, visual description or other representation of any kind knowingly made in connection with the sale, lease, rental or loan of goods or services or in the extension of credit or in the collection of debts by any person in the regular course of his trade or commerce, which may, tends to or does deceive or mislead any person and includes but is not limited to:

. . . .

(15) stating that a transaction involves rights, remedies or obligations that it does not involve.

Section 57–12–2(D). The Bank makes three arguments in support of its position that it did not violate the statute: (1) failing to acknowledge liability under the FTC Holder Clause is not a "false or misleading statement"; (2) even if the Bank's action constituted a statement, it did not deceive or mislead anyone; and (3) the Bank was entitled to refuse to concede liability. We disagree with all three of the Bank's arguments.

{28} First, the Bank argues that because the trial court did not adopt Plaintiff's requested findings on misrepresentation, there could be no violation of the UPA. However, the trial court did find that the Bank refused to acknowledge liability pursuant to the FTC Holder Rule. The Bank's refusal to acknowledge liability was a false representation that misled Plaintiffs into believing they were liable to the Bank on the contract when they were not. A false representation such as the one the Bank made fits within the statutory definition of an unfair practice, which includes "stating that a transaction involves rights, remedies or obligations that it does not involve." Section 57–12–2(D)(15) The UPA does not require a statement, but rather any representation. Section 57–12–2(D).

{29} Second, the Bank's refusal to acknowledge liability could, tended to, or did deceive or mislead. Section 57–12–2(D). The FTC Holder Rule holds the assignee—in this case the Bank—liable for any claims that the consumer may have against the seller. The Bank had no legal or factual basis for claiming that it could not be held liable for the claims against the seller. Thus, its denial of liability was both false and misleading to Plaintiffs. The Bank contends that because Plaintiffs were represented by counsel at the time they revoked their acceptance of the mobile home, they could not have been deceived by the Bank's refusal to acknowledge liability. Simply because Plaintiffs were represented by counsel, however, does not mean that the Bank's actions did not mislead or deceive them; the Bank misled Plaintiffs by telling them they were still responsible for payment even after acceptance was revoked.

{30} Third, we do not agree that the Bank was entitled to refuse to concede its liability under the FTC Holder Rule. As noted above, the rule is straightforward in holding the assignee subject to all claims the consumer might bring against the seller. Requiring the Bank to concede this liability does not prevent it from asserting any defenses it might have to those claims. It does, however, prevent the Bank from asserting that no claims may be brought against it. *See Ford Motor Co. v. Mayes*, 575 S.W.2d 480, 485–86 (Ky.Ct.App.1978) (holding that refusal to recognize remedies available under the UCC is a violation of unfair practices act) *cf. Pub. Serv. Co. v. Diamond D Constr. Co.*, 2001–NMCA–082, ¶¶ 37–44, 131 N.M. 100, 33 P.3d 651 (holding, in response to an argument that there could be no culpable mental state when a party breaching a contract testified that her interpretation of the ambiguous contract was reasonable, that substantial evidence supported an opposite conclusion and that punitive damages could be awarded notwithstanding the party's professing of her beliefs).

{31} We find the Bank's arguments unpersuasive, and we therefore hold that the Bank's refusal to acknowledge its liability under the FTC Holder Rule was tantamount to an incorrect and misleading assertion that no claims could be brought against it and therefore was a violation of the Unfair Practices Act, particularly considering all of the other failings the trial court found on the part of the Bank. We find the Bank's contrary arguments to be based on an unduly technical parsing of the trial court's findings. We construe findings to uphold, rather than defeat, a judgment. *Smith v. Galio*, 95 N.M. 4, 6, 617 P.2d 1325, 1327 (Ct.App.1980).

## Commercial Defamation

{32} The Bank maintains that it did not defame Plaintiffs when it reported them delinquent on payments on the mobile home because truth is a complete defense to a defamation claim. We agree that truth is a complete defense to a defamation claim. *Newberry v. Allied Stores, Inc.*, 108 N.M.

424, 430, 773 P.2d 1231, 1237 (1989). However, the report that Plaintiffs were delinquent on payments was false. The sales contract had been revoked. Therefore, payments were no longer required and the Bank could not hold Plaintiffs in default for not paying.

{33} The Bank argues that it was simply stating its good faith position with regard to the contract when it reported the payments in default. The trial court found, however, that Plaintiff's notice of revocation made the notice of default inoperative. The trial court also found that the Bank acted in bad faith when it refused to acknowledge the revocation, and substantial evidence supports this determination. Therefore, we cannot say that the Bank was truthfully reporting its good faith position regarding the account.

*Plaintiff's Cross–Appeal*

**Insurance Proceeds**

{34} Plaintiffs argue that the trial court erred in awarding the full amount of the insurance proceeds to the Bank. A secured seller has a security interest in insurance proceeds up to the extent of the loss. *See Teague–Strebeck Motors, Inc. v. Chrysler Ins. Co.*, 1999–NMCA–109, ¶ 43, 127 N.M. 603, 985 P.2d 1183 (explaining that the insurable interest ordinarily should not exceed the potential loss to the insured). In this case, the insurance company paid $15,317. Plaintiffs argue that the loss was only $5,500, as suggested by the Bank's evidence of refurbishing costs. We view this issue as a claim of insufficient evidence to support the trial court's award of the full insurance proceeds to the Bank. Upon a claim of insufficient evidence, we view the evidence in the light most favorable to the fact finder's decision. *Sanchez*, 2000–NMCA–099, ¶ 12, 129 N.M. 742, 13 P.3d 960. We do not re-weigh the evidence or determine credibility of the witnesses. *Id.*

{35} Here, evidence was presented that the insurance claim check was for $15,317. The trial court found that the check was for structural damage to the mobile home. Plaintiffs do not attack that finding. Nor do they attack the trial court's refusal to find that the damage could be repaired for about $7,000. Therefore, we accept the court's findings. *Stueber v. Pickard*, 112 N.M. 489, 491, 816 P.2d 1111, 1113 (1991) (holding that an unchallenged finding of the trial court is binding on appeal). Based on the court's finding that the insurance claim check was for structural damage, the check was properly awarded to the Bank.

{36} Plaintiffs argue that the Bank's witness testified to repair costs of only $5,500. Thus, they contend, the Bank would get a windfall from the insurance proceeds. The trial court reasonably could have determined that the amount of the insurance proceeds represented the damage to the mobile home, even though the Bank's witness testified to much lower repair costs. This was simply a credibility issue, left to the finder of facts. *Sanchez*, 2000–NMCA–099, ¶ 12, 129 N.M. 742, 13 P.3d 960.

{37} The evidence supports the trial court's award of the insurance proceeds to the Bank.

**Attorney Fees**

{38} Plaintiffs argue that the trial court erred in awarding them only $20,000 in attorney fees when they had requested $55,000. The trial court determined that only a portion of the fees requested were related to the UPA claim and accordingly reduced the amount claimed. We review the trial court's award of attorney fees for ·an abuse of discretion. *Lenz v. Chalamidas*, 113 N.M. 17, 18, 821 P.2d 355, 356 (1991).

{39} Plaintiffs contend that the trial court misapprehended the basis and theory supporting the fees. In this case, attorney fees are allowed only for the UPA claim. *See* § 57–12–10(C). Thus, the trial court was required to review the request and determine what portion of the work done was attributable to the UPA claim. *See Hinkle v. Cadle Co.*, 115 N.M. 152, 158, 848 P.2d 1079, 1085 (1993) (holding that the trial court should attempt to distinguish between two types of work to the extent possible). Plaintiffs contend that the entire case was based on the Bank's recalcitrance and insistence that it had no obligation to them and, thus, the UPA underlay all the claims. We disagree.

{40} The UPA claim was only one of a number of claims alleged in the complaint. It was based on the Bank's demand for payment despite notice of revocation and its practice of refusing to recognize claims against it pursuant to the FTC Holder Clause. In addition to this claim, Plaintiffs alleged breach of warranties, right to revoke, breach of contract, and commercial defamation. These claims were distinct from the UPA claim. While it is true that some facts are common to all the claims, it is still possible to separate the claims and the proofs required for each.

{41} Because the UPA claim was the only claim for which Plaintiffs could be awarded attorney fees, the trial court was obligated to separate the claims and determine the amount of time spent on each. *See Gonzales v. N.M. Dep't of Health,* 2000–NMSC–029, ¶¶ 35–36, 129 N.M. 586, 11 P.3d 550 (holding that in a case where the attorney fees were governed by the Human Rights Act, when plaintiff is only partially successful, the trial court cannot award fees for hours spent on the entire litigation). Plaintiffs argue that there was no evidence that the UPA claims were separate or could be separated from the other claims. They argue that it was the burden of the Bank to show that the time was separable. We disagree. Once Plaintiffs made their claim for the attorney fees, it was left to the discretion of the trial court to make the award based upon Plaintiffs' proof of the reasonableness of the fees. *Hinkle,* 115 N.M. at 155, 848 P.2d at 1082. The Bank did not have to object to the time or show that it was separate. It was for the trial court to review the claim made by Plaintiffs and in its discretion determine what fees to award. We cannot say that the trial court abused its discretion by reducing the request for attorney fees to that amount relating solely to the UPA claim.

{42} Plaintiffs also argue that the trial court erred in failing to make findings of fact on the attorney fees issue. We disagree. First, it does not appear that the parties requested any findings on the issue. *Cockrell v. Cockrell,* 117 N.M. 321, 324, 871 P.2d 977, 980 (1994) (holding that a party waives error in court's failure to make find-

ings by his failure to request or submit findings). Second, the trial court stated its rationale for the award on the record. Thus, we are able to review the determination. We find no error in the failure to make findings on the issue and see no reason to remand to the district court for entry of such findings.

{43} The trial court did not abuse its discretion in reducing Plaintiffs' attorney fees request and limiting it to the UPA claim.

**Amended Findings**

{44} It appears that the Bank sought to have the trial court amend its findings and conclusions to include an offset against the judgment in the amount of $29,827, representing the rental value for Plaintiffs' use of the mobile home from the time it was purchased. The trial court amended its findings, but made it clear that the amended findings did not affect its conclusions. We agree with Plaintiffs that the trial court understood the Bank's motion to be one to amend its proposed findings, and the motion was granted only to that extent. The trial court orally denied those findings, and while it may have signed the Bank's proposed order, the order was sufficiently ambiguous as to whether it provided the relief that Bank now contends was granted. Moreover, the judgment entered after the order did not contain any offset. Thus, the Bank may not offset any portion of the money judgment as the trial court did not so order.

**CONCLUSION**

{45} We affirm the trial court's decision in all respects.

{46} **IT IS SO ORDERED.**

WE CONCUR: LYNN PICKARD and IRA ROBINSON, Judges.