The slip opinion is the first version of an opinion released by the Clerk of the Court of Appeals. Once an opinion is selected for publication by the Court, it is assigned a vendor-neutral citation by the Clerk of the Court for compliance with Rule 23-112 NMRA, authenticated and formally published. The slip opinion may contain deviations from the formal authenticated opinion.

# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: _____

Filing Date: **March 25, 2024**

**No. A-1-CA-40031**

**LYNN POLLOCK, as Trustee of the
Lewis G. and Lynn J. Pollock Revocable
Trust, dated December 3, 2001, as
amended,**

Plaintiff-Appellant/Cross-Appellee,

v.

**PAUL THOMPSON and PAUL
THOMPSON & ASSOCIATES, INC.,**

Defendants-Appellees/Cross-Appellants.

**APPEAL FROM THE DISTRICT COURT OF SANTA FE COUNTY
Bryan Biedscheid and David K. Thomson, District Court Judges**

Herdman MacGillivray Fullerton Cameron
Pumarejo Honeycutt, PC
Frank T. Herdman
David J. Pumarejo
Santa Fe, NM

for Appellant

Fuqua Law & Policy, P.C.
Scott Fuqua
Santa Fe, NM

for Appellees

**OPINION**

**BUSTAMANTE, Judge, retired, sitting by designation.**

{1}     The issues in this case involve the meaning and effect of two one-page, handwritten documents—a promissory note for money lent (the Note), and a profit sharing agreement (the Agreement)—hastily negotiated, drafted and signed by the parties in April 2007. After a bench trial, the district court ruled, in part, that the Note and the Agreement comprised one contract enforceable against Defendants Paul Thompson and Paul Thompson & Associates, Inc. (collectively, Defendants), but that the Agreement terminated when the Note was paid in full. Plaintiff Lewis Pollock appeals from this judgment. Thompson and Paul Thompson & Associates, Inc. (the Company) defend the district court's ruling in response to Pollock's arguments, but cross-appeal, arguing that the district court erred in concluding that there was a meeting of the minds or sufficient consideration to support imposing any obligations on them under the Agreement. In addition, Defendants appeal from the district court's summary judgment dismissing their counterclaim for malicious abuse of process against Pollock. We affirm, though on different grounds than the district court's rationale.

**Factual and Procedural Background**

{2}     Drawn from the district court's order, we provide a short summary of the undisputed events leading up to and culminating in the creation of the Note and the

Agreement. Pollock and Thompson first met at the Eldorado Hotel in Santa Fe where Thompson worked as a parking valet. Pollock and Thompson remained acquaintances and became casual but not social friends. Thompson also ran a business driving people—including Pollock and his family—to and from the airport in Albuquerque in their cars.

{3} On April 19, 2007, Thompson telephoned Pollock asking to meet with him to discuss a business matter. The following morning Thompson and Pollock met at Pollock's home. Thompson explained that he needed money quickly to buy a certain 1998 740 iL BMW (the BMW), so he could start a limousine/auto for hire business. Thompson asked Pollock for a loan in the amount of $9,000 so he could buy the BMW. Thompson asserted that the BMW was worth $11,000 and that he needed to act quickly before it was sold to someone else. Pollock responded that he did not make loans to anyone and suggested that Thompson look elsewhere. Thompson replied that Pollock was his "only hope to get the money," and suggested that he would be willing to share the profits from the limousine/auto for hire business on a 50/50 basis.

{4} After further discussion, Thompson and Pollock agreed to an arrangement then acceptable to both of them with regard to the repayment terms of the Note and the percentage level of profit sharing under the Agreement. Pollock—a Harvard-educated lawyer—drafted the handwritten Note and Agreement that morning.

Thompson and Pollock signed the Note and the Agreement immediately, and Pollock gave Thompson a $9,000 check for purchase of the BMW.[1] Thompson paid the Note in full in early October 2007.

{5} Pollock filed his first complaint in November 2015 alleging that Defendants had breached their duty under the Agreement to share profits. Following a period of discovery and motion practice, Pollock filed a first amended complaint broadening his theories of recovery to include breach of the covenant of good faith and fair dealing, unjust enrichment, and to request an accounting as well as punitive damages. Two weeks later—following the depositions of Pollock and Thompson—Pollock submitted an unopposed motion to file a second amended complaint deleting the counts requesting damages and limiting the case to a declaratory judgment action addressing the "validity, enforceability and interpretation of the Agreement," which was granted. Thompson's answer to Pollock's second amended complaint included a counterclaim for malicious abuse of process.

{6} The district court held a bench trial limited to the issues raised in the second amended complaint. The only witnesses at the trial were Pollock and Thompson. Following the trial, the district court entered a detailed twenty-one page order. Following additional motion practice and two failed attempts to perfect an appeal to

---

[1]Copies of the Note and the Agreement are attached to this opinion.

this Court, the parties agreed to a stipulated final order that summarized the district court's order as follows:

> [The district court] entered that certain [o]rder on April 16, 2018 ("Order") after a one-day bench trial. The Order held that [Pollock] was entitled to a share of profits, for the subject BMW only, from the date the original parties to this action entered into an agreement, April 20, 2007, through the date [the district court] determined such agreement was terminated, October 3, 2007. [The district court] determined that . . . Plaintiff['s] share of the profits included information related to the sale of [the] BMW, including how, where and to whom the BMW was sold.

{7} The stipulated order also noted the parties' agreement that "no damages are to be awarded to Plaintiff based on the accounting provided by Defendants" unless the district court's order "is reversed on appeal in whole or in part."

**DISCUSSION**

**Pollock's Appeal**

{8} On first review, the Note and the Agreement seem straightforward. But that surface simplicity does not bear up under closer examination. The two documents present a surprisingly slippery scenario for interpretation and construction that the parties have litigated thoroughly here and in the district court. The parties disagree, for example, as to whether the two documents comprise one "agreement," or whether they should be treated as two separate contracts. They disagree as to whether the contract was solely for a loan. They disagree as to whether documents are ambiguous or not. They disagree as to whether the profit sharing aspect of the Agreement

4

covered only profits from use of the BMW, or instead extends to all businesses Thompson has developed over the seventeen years since it was signed. Assuming that the Agreement can be interpreted to encompass all of Thompson's businesses, they argue about whether there was sufficient consideration to support a contract of that magnitude. They disagree whether there was a "meeting of the minds" sufficient to support the creation of a contract—in particular the expanded scope Pollock argues for.

{9}     The district court's order wrestled with these arguments with varying degrees of success. Interesting as these issues might be, we do not need to address them all. The district court concluded that the parties' arrangement—whatever its content and parameters might be—was terminated when the Note was paid in full on October 3, 2007. Affirming the district court on this point would as a practical matter resolve all of the issues regarding the scope of the Agreement. It is necessary, however, to decide whether any enforceable contract was created between the parties. The following analysis addresses the contract formation issues first and then turns to assess the district court's ruling that payment of the Note ended the parties' contract entirely.

## I.     The Parties Entered Into an Enforceable Contractual Arrangement

{10}     The parties' arguments on the issue of whether a contract was formed are at extremes. Pollock maintains that Thompson agreed to share with him—and his

daughter after Pollock's death—35 percent of "all profits" from "the limousine/auto for hire business" for as long as Thompson maintained the business. Pollock also argues that he is owed 35 percent of all profits represented in the proceeds of any sale or liquidation of the business. Thompson's position on appeal is more nuanced. In his answer to Pollock's appeal, he argues that the district court's decision that the contract was limited to profits from use of the BMW should be affirmed. In his cross-appeal briefing, however, he argues that there was no contract formed at all.

{11}    It is unclear how the district court resolved the issue.[2] The district court's order found as a matter of fact that "[t]here were not materially different understandings of the parties concerning the obligation . . . Thompson would bear to [Pollock] under the Agreement." But the order does not explain what undergirds this finding. The district court also found as a matter of fact that the Note and the Agreement "constitute the full and complete extent of any contractual relationships" between Pollock and Defendants. The district court thus rejected Pollock's assertions and requested findings—supported by testimony at trial—that the parties also entered into verbal side agreements that were not reflected in the documents Pollock drafted. We note that this finding can also function as a conclusion of law. Reading it as a conclusion of law helps explain the district court's decision to try and

_____

[2]We note that neither party adequately addresses the internal conflicts in the district court's order. Each party instead relied on only the portions of the order that supported their position. This complicated our review.

treat the Agreement as unambiguous. *Jaramillo v. Gonzales*, 2002-NMCA-072, ¶ 31, 132 N.M. 459, 50 P.3d 554 ("We construe findings to uphold, rather than defeat, a judgment.").

{12} The district court also concluded as a matter of law that "[t]he Agreement does not entitle [Pollock] to a 35[ percent] share of every business venture pursued by the Company," but rather that the share-of-profits language of the Agreement was limited to profits generated from the use of the BMW. Again, it is unclear what factual background the district court relied on for this conclusion. We find it significant that in this conclusion of law the district court relied on concepts related to the interpretation of ambiguous contracts to bolster its rationale even though it had previously concluded that the "contracts are not ambiguous." Conclusion of Law No. 12 of the order states in pertinent part:

> The language [Pollock] used to describe the scope of . . . Thompson's obligations under the Agreement cannot reasonably be construed so broadly. Assuming that the phrases "all profits" and "limousine/auto for hire business" are ambiguous, that ambiguity is to be construed strictly against [Pollock]. Consequently, the Agreement would entitle [Pollock] to a 35[ percent] share of all profits generated by the Company's "limousine/auto for hire business[,"] as used by the BMW.

{13} The portions of the district court's order referenced above demonstrate cross currents in the district court's ruling that make it difficult to interpret and analyze. Perhaps the most problematic aspect of the order is the district court's apparent decision to interpret the language of the Agreement without directly referencing any

7

of the testimony it heard at the trial. That approach is proper if the language of a writing is actually unambiguous. *See Benz v. Town Ctr. Land, LLC*, 2013-NMCA-111, ¶ 31, 314 P.3d 688 ("The purpose, meaning, and intent of the parties to a contract is to be deduced from the language employed by them; and where such language is not ambiguous, it is conclusive." (alteration, internal quotation marks, and citation omitted)). Conversely, to rely purely on the language in a document is not appropriate if the language is ambiguous. *ConocoPhillips Co. v. Lyons*, 2013-NMSC-009, ¶ 10, 299 P.3d 844 ("If the proffered evidence of surrounding facts and circumstances is in dispute, turns on witness credibility, or is susceptible of conflicting inferences, the meaning must be resolved by the appropriate fact-finder." (alteration, internal quotation marks, and citation omitted)).

{14}     Ambiguity is a question this Court reviews de novo. *Env't Control, Inc. v. City of Santa Fe*, 2002-NMCA-003, ¶ 14, 131 N.M. 450, 38 P.3d 891 ("A contract is deemed ambiguous only if it is reasonably and fairly susceptible of different constructions. Whether ambiguity exists is a question of law; therefore, this Court reviews the district court's decision de novo." (citation omitted)). We conclude that the Agreement is ambiguous.

{15}     The Agreement includes at least three provisions that are reasonably susceptible to different constructions. Two are not directly at play in this appeal and

we need not discuss them further.[3] The meaning of and intent behind the phrase "the limousine/auto for hire business," however, is vexingly vague. On its face, there is no definitive way to determine the scope of the obligation imposed on Thompson by the phrase. Viewed in isolation—that is, as words without context—the phrase can be read to contemplate only a "limousine/auto for hire business" conducted solely through the BMW. But it could also reasonably be construed more broadly to contemplate the continuing enterprise that the Company has become. Both obviously fit within the abstract concept of the phrase, and there are no other internal terms that help explain its scope. Thus, we conclude that the phrase cannot reasonably be viewed as clearly and unambiguously expressing the agreed upon intent of the parties. It is simply too broad and vague. As such the Agreement is ambiguous. *See id.* (concluding that the settlement agreement at issue there was not ambiguous because the meaning of "minimum" was elucidated by the stated term of the contract itself).

{16}     Broadly speaking, our case law recognizes two pathways for resolving ambiguities in contract documents. If the parties do not offer evidence of the facts

---

[3]First, it is unclear how the payment obligation under the Note should be coordinated with the requirement in the Agreement that Pollock would be owed $9,000 if the BMW was sold. In his testimony, Pollock disclaimed any right he might have under the Agreement to the payment. Second the meaning of "all profits" is not a material issue given the district court's ruling that the profit sharing provision was limited to profits from use of the BMW described in the Agreement. In the absence of that ruling, the meaning of "all profits" would pose a vexing problem.

and circumstances surrounding the execution of a document, courts may interpret—or construe—documents memorializing agreements "using accepted canons of contract construction and traditional rules of grammar and punctuation." *Mark V, Inc. v. Mellekas*, 1993-NMSC-001, ¶¶ 11-13, 114 N.M. 778, 845 P.2d 1232. That route was not available to the district court in this case because both parties introduced evidence—without objection—as to the circumstances surrounding the genesis, negotiation, creation, and signing of the Note and the Agreement. Given the plethora of evidence submitted, the district court was bound to resolve the issue of the meaning of the phrase in the context of the evidence. *See ConocoPhillips*, 2013-NMSC-009, ¶ 10.

{17}    In attempting to interpret the Agreement on its face, the district court set itself an impossible task. Without context provided by the evidence, there is no way to choose between the parties' interpretations. The order reflects this dilemma in that the district court ultimately settled on an interpretation that necessarily relied on the parties' testimony.

{18}    As noted above, the district court's order reflects two conclusions of law directly addressing the meaning of the phrase "limousine/auto for hire business." Conclusion of Law No. 4 flatly states that the "contracts are not ambiguous" and that Thompson's obligation under the Agreement is to pay Pollock 35 percent of the

profits generated by operation of "a limousine/auto for hire business, using the BMW."[4]

{19} In Conclusion of Law No. 12, the district court first decided that the "Agreement cannot reasonably be construed so broadly" as to encompass "every business venture pursued by the Company." But then—perhaps out of an abundance of caution—the district court also concluded that "assuming" the phrase is ambiguous, the "ambiguity is to be construed strictly against [Pollock]" and thus limited the reach of the phrase to income derived from the BMW.

{20} It is clear to this Court that in ruling as it did, the district court—consciously or unconsciously—accepted Thompson's version of the conversations and negotiations that occurred at the parties' meeting in April 2007. The ruling "fits" Thompson's testimony that the parties' focus was on the BMW, that they talked only about the BMW, and that they did not discuss future development of the "limousine/auto for hire business."

{21} Fortunately, the district court entered a finding of fact that supports that reading of its ruling. Describing the conversation and negotiation leading up to the signing of the Note and the Agreement, Finding of Fact No. 18 states, "Thompson

---

[4]Pollock makes much of the fact that the conclusion of law mistakenly includes the words "using the BMW" when quoting the Agreement. There is no indication that the district court thought those words were in the Agreement, and we ignore the mistake as a simple typographical error. *See Jaramillo*, 2002-NMCA-072, ¶ 31.

proceeded to state that if Pollock would loan the Company $9,000[] for the purchase of the BMW, Thompson (who owned the Company) was willing to share a portion of profits arising from the limousine/auto for hire business with Pollock, as it related to the use of the BMW." This is a clear finding that the district court credited Thompson's testimony that the parties only discussed profit sharing in connection with use of the BMW. It is also noteworthy that Pollock did not provide any testimony contradicting Thompson's description of the conversation. Thompson's testimony provides substantial evidence supporting the district court's findings of fact. *See Las Cruces Pro. Fire Fighters v. City of Las Cruces*, 1997-NMCA-044, ¶ 12, 123 N.M. 329, 940 P.2d 177 (noting that in reviewing a substantial evidence claim, "[t]he question is not whether substantial evidence exists to support the opposite result, but rather whether such evidence supports the result reached" and "we will not reweigh the evidence nor substitute our judgment for that of the fact[-]finder"). And Finding of Fact No. 18 in turn supports the district court's ultimate ruling that the profit sharing arrangement was limited to use of the BMW.

{22} The discussion above disposes of Pollock's appeal in Thompson's favor, though on different grounds. In his cross-appeal, Thompson argues that there was no meeting of the minds as to the scope of the arrangement between him and Pollock—that is, whether the deal was limited to use of the BMW, or whether it was

broader—and thus no contract was created at all. For the sake of completeness we address his argument.

{23}     "For an offer and acceptance to create a binding contract, there must be an objective manifestation of mutual assent by the parties to the material terms of the contract." *Pope v. Gap, Inc.*, 1998-NMCA-103, ¶ 11, 125 N.M. 376, 961 P.2d 1283. Unexpressed intentions or understandings of the parties will not be given operative effect in deciding what the parties agreed to. *Id.* ¶ 13. As such, misunderstandings concerning the meaning of the terms in a written contract can result in a failure to form an enforceable agreement. But, as our case law makes clear, misunderstandings between the parties can be resolved depending on the evidence presented at trial concerning the circumstances surrounding the parties' interaction as they discussed their arrangement. In *Pope*, this Court recognized that

> [t]he manifestations of the parties are operative in accordance with the meaning attached to them by one of the parties if
>
> > (a) that party does not know of any different meaning attached by the other, and the other knows the meaning attached by the first party; or
> >
> > (b) that party has no reason to know of any different meaning attached by the other, and the other has reason to know the meaning attached by the first party.

*Id.* (citing Restatement (Second) of Contracts § 20(2) (1981)). Our discussion above affirms the district court's finding that Thompson described an arrangement involving only use of the BMW, and that Pollock did not describe any other

conversation in April 2007. In addition, the district court refused to accept Pollock's assertion that Thompson agreed to extend the profit sharing to Pollock's daughter in the event of his death. Thus, Pollock knew what Thompson thought he was agreeing to and Pollock did not express any different understanding. Under *Pope* and the Restatement, that is sufficient to form an enforceable agreement.

{24} We, of course, appreciate that we have diverged from the decisional path the district court followed. Thus, we must consider whether our approach adheres to our "right for any reason" case law. New Mexico cases make clear that "even if the district court offered erroneous rationale for its decision, it will be affirmed if right for any reason" so long as reliance on a new ground is not unfair to the appellant. *Meiboom v. Watson*, 2000-NMSC-004, ¶ 20, 128 N.M. 536, 994 P.2d 1154. In this case, we need to be mindful that our approach is fair to both parties given that we are presented with an appeal and a cross-appeal.

{25} The primary source of potential unfairness when applying the right for any reason approach involves factual issues. Appellate courts must be careful not to "delve into fact-dependent inquires." *Id.* (alteration, omission, internal quotation mark, and citation omitted). We should not "look beyond the factual allegations raised and considered in the district court." *TexasFile LLC v. Bd. of Cnty. Comm'rs*, 2019-NMCA-038, ¶ 10, 446 P.3d 1173.

14

{26} We have not overstepped our bounds. The parties fully argued all of the factual and legal issues we address—at times switching positions as they apparently deemed their legal strategy to require.[5] And, the parties fully argued the legal effect of the testimony provided by Pollock and Thompson in their proposed findings of fact and conclusions of law as well as their written closing arguments to the district court. Our resolution simply reframes and resolves the arguments in a more appropriate context.

## II.     The Note and the Agreement Formed One Contract

{27} We agree with the district court's analysis concerning the unitary nature of the Note and the Agreement. It bears repeating that the two documents were negotiated, created, and signed all in the same morning. The district court relied, in part, on an Illinois case that stated the applicable principle succinctly. "The well-settled rule of contract law is that when two or more written documents are executed by the same contracting parties as part of the same transaction, those documents will be read and considered together as one contract encompassing the entire agreement between the parties, unless there is evidence that the parties intended for the documents to be read separately." *Int'l Supply Co. v. Campbell*, 907 N.E.2d 478,

---

[5] Pollock argued to the district court that the Note and Agreement are ambiguous, whereas he argues the opposite in the briefs to us. Similarly, Thompson argued that the documents were not to the district court, and argues the opposite here.

486 (Ill. App. Ct. 2009). We agree with the Illinois Court's statement of the principle. We also note that New Mexico case law agrees with this approach. *Levenson v. Haynes*, 1997-NMCA-020, ¶ 14, 123 N.M. 106, 934 P.2d 300; *Master Builders, Inc. v. Cabbell*, 1980 NMCA-178, ¶ 8, 95 N.M. 371, 622 P.2d 276. And, finally, there is no evidence contraindicating use of that approach here.

### III. Payment of the Note Terminated the Entire Contract

{28}    The district court followed two independent paths to its termination decision. One path involved a complicated exploration of the differences between debt and capital contributions as a means of funding businesses. The district court first determined that the two documents comprised one contract. The district then concluded that the transaction most closely resembled debt, and as such, once the debt was satisfied, the contract was ended. We note that neither party mentioned—much less argued—this theory in their arguments to the district court. As such, it appears that the district court undertook the inquiry sua sponte.

{29}    The district court's other path is more straightforward. Thompson testified that in September 2007 his girlfriend read the Agreement and told him that it could be interpreted to cover much more than the profits derived from just use of the BMW. Alarmed, Thompson spoke with Pollock and asked him if he intended that broad a reading. Pollock responded "yes." Thompson testified that he told Pollock that was not his understanding and asked how he could get out of the arrangement.

16

Thompson testified that Pollock told him he would release him from the obligation if the Note was paid in full. Pollock provided Thompson an account number and Thompson paid the Note in full within a few days by depositing $8,100 in the account. Pollock denied having the conversation described by Thompson.

{30}   The district court accepted Thompson's version of the September meeting when it concluded that

> [t]he Agreement had been successfully formed and was supported by adequate consideration and it terminated on October 3, 2007 when, in accordance with [Pollock]'s instructions and agreement, . . . Thompson deposited in an account owned or controlled by [Pollock] the $8,100[] still outstanding on the . . . Note. Given that agreed termination, [Pollock] can no longer claim any entitlement to any share of the profits of the Company.

{31}   We recognize that this language appears in the "Conclusions of Law" portion of the district court's order. The intermingling of findings of fact and conclusions of law is not a preferred practice, but it is also not uncommon. This Court has observed in a few cases that "the occasional intermixture of matters of fact and conclusions of law is not reversible error." *Sheraden v. Black*, 1988-NMCA-016, ¶ 10, 107 N.M. 76, 752 P.2d 791; *see In re Estate of Hilton*, 1982-NMCA-104, ¶ 17, 98 N.M. 420, 649 P.2d 488 ("Ultimate facts and conclusions of law are often indistinguishable, and their intermixture in the court's decision as written does not create reversible error where a fair construction of them justifies the court's judgment."). In this case the combined findings of fact and conclusions of law fit the testimony the district

17

court heard. And, Thompson's testimony stands as substantial evidence supporting the district court's decision. It cannot be denied that Thompson's testimony constitutes "evidence that a reasonable mind would find adequate to support a conclusion" of law. *See Weidler v. Big J. Enters., Inc.*, 1998-NMCA-021, ¶ 30, 124 N.M. 591, 953 P.2d 1089.

**{32}** Pollock argues that Thompson had the burden to provide evidence that met the "clear and convincing" rubric to adequately support the assertion that Pollock agreed to terminate the Agreement. We are not aware of any authority in New Mexico requiring an elevated standard of proof in this context, and Pollock does not cite to any. We thus assume there is none. Pollock's only citation is to 17A Am. Jur. 2d *Contracts* § 527 (2024). That section does not address, much less support, Pollock's broad assertion. 17A Am. Jur. 2d *Contracts* § 527. In any event, we fail to see why Thompson's testimony does not—or could not—meet the standard. *See Duke City Lumber Co. v. Terrel*, 1975-NMSC-041, ¶ 5, 88 N.M. 299, 540 P.2d 229.

**{33}** We recognize that termination of the Agreement as described requires "new" consideration to support it. *See* Restatement (Second) of Contracts § 273 (1981). Pollock argues that early payment in full of the Note cannot stand as consideration for termination of the Agreement because payment simply took care of an existing obligation. In making this argument Pollock ignores the fact that while the Note *allowed* prepayment without penalty, it in no way required any early payment. By

paying the Note in full before it became due, Thompson undertook something he was not required to do. And, the payment bestowed a real benefit on Pollock: he got his money back early, with interest, and he was relieved of the risk he had undertaken in loaning the money to a start-up operation with no track record. Reducing risk was an obvious and real benefit to Pollock. As Pollock noted in his briefing to the district court, consideration consists—or can consist—of a promise to do something that a person is under no obligation to do. *Luginbuhl v. City of Gallup*, 2013-NMCA-053, ¶ 15, 302 P.3d 751. Prepayment of the Note fits that description.

**Thompson's Cross-Appeal**

{34}    Thompson filed a counterclaim for malicious abuse of process as part of his answer to Pollock's second amended complaint. The parties agreed to bifurcate and try the counterclaim after the trial on the second amended complaint. Nine and a half months after entry of the order discussed above, Pollock filed a motion for summary judgment on the counterclaim. Thompson responded within three weeks, and the district court entered its order granting the motion five days after. The district court did not provide any detailed explanation of its rationale in the order.

{35}    On appeal, Thompson argues that summary judgment was improper because the district court's order following the declaratory action trial did not resolve the factual question as to whether Pollock agreed to terminate the Agreement in September 2007. If the district court were to find that Pollock did agree to terminate

the Agreement, Thompson argues, he would be in a strong position to prove one of the elements of his malicious abuse of process claim: that Pollock did not have probable cause to file the action. *See Fleetwood Retail Corp. of N.M. v. LeDoux*, 2007-NMSC-047, ¶¶ 12-13, 142 N.M. 150, 164 P.3d 31.[6] In response, Pollock appears to agree that the district court's order did not resolve the termination issue, but then—curiously—goes on to note that the testimony on the issue at trial was essentially diametrically opposed. Comparing the arguments would in most cases result in reversal because they highlight the existence of factual questions. That result is not appropriate here because Pollock also argues that under *Fleetwood* any recovery by Pollock provides an absolute defense on a malicious abuse of process claim founded on lack of probable cause.

{36} In *Fleetwood* the Supreme Court answered two questions certified by this Court concerning the contours of the new malicious abuse of process tort described in *Devaney v. Thriftway Marketing Corp.*, 1998-NMSC-001, ¶¶ 13-17, 24, 124 N.M. 512, 953 P.2d 277 (combining previously separate torts of "abuse of process" and "malicious prosecution" and holding that the new tort could asserted as a counterclaim to the original action). *Fleetwood*, 2007-NMSC-047, ¶ 19. The certified questions were:

---

[6]We note that this argument is contrary to Thompson's briefing on appeal on the same subject. The switch in position is interesting, but not dispositive of the summary judgment issue.

(1) When a [malicious abuse of process] plaintiff relies on lack of probable cause to demonstrate misuse of process, is the lack of probable cause determined as to the underlying complaint generally, or as to each count separately?

(2) Does a verdict for the [original proceeding plaintiff] on one or more counts provide an absolute defense to the [malicious abuse of process] plaintiff's entire . . . claim even though other counts brought by the [original proceeding plaintiff] were brought without probable cause or for an improper purpose and even though the [malicious abuse of process] plaintiff incurred substantial attorney's fees in defending against the non-meritorious claims?

*Id.* ¶ 18.

{37} The Supreme Court concluded that lack of probable cause should be determined taking into account the underlying complaint as a whole. *Id.* And, the Court also reaffirmed that a "win" for the original proceeding plaintiff as to one or more counts of their complaint provides an absolute defense against a claim of malicious abuse of process. *Id.* ¶¶ 2, 19. As the Court phrased it, "the defendant must win the entire case as a condition to proceeding with a malicious abuse of process counterclaim based on lack of probable cause." *Id.* ¶ 2. The Supreme Court's ruling was based on traditional concerns for safeguarding the right of access to the courts for honest litigants and avoiding the multiplicity of suits that might be encouraged by a more lax rule. *Id.* ¶¶ 19, 21.

{38} We have affirmed the district court's ruling based on Pollock's argument that the Note and the Agreement comprised one contractual arrangement that included an aspect of profit sharing, and that Pollock was entitled to an accounting for the six

month period from April 2 to October 3, 2007. The conclusion that there was a contract provides a complete defense under *Fleetwood*.[7]

**CONCLUSION**

{39} For the reasons stated herein, we affirm the district court.

{40} **IT IS SO ORDERED.**

_____
**MICHAEL D. BUSTAMANTE, Judge, retired, Sitting by designation.**

**WE CONCUR:**

_____
**KRISTINA BOGARDUS, Judge**

_____
**SHAMMARA H. HENDERSON, Judge**

---

[7]We do not understand Thompson to make any argument that he founds his counterclaim on any procedural impropriety. To the extent he might be attempting to do so, we would reject it as unpreserved given that he did not make such an argument to the district court. *See Benz*, 2013-NMCA-111, ¶ 24 ("To preserve an issue for review on appeal, it must appear that appellant fairly invoked a ruling of the trial court on the same grounds argued in the appellate court." (internal quotation marks and citation omitted)).

22

# AGREEMENT

THIS AGREEMENT, DATED APRIL 20, 2007 BETWEEN PAUL THOMPSON AND LEWIS POLLOCK, BOTH OF SANTA FE, NEW MEXICO.

WHEREAS THE PARTIES WISH TO MEMORIALIZE CERTAIN UNDERSTANDINGS BETWEEN THEM,

FOR VALUE RECEIVED, IT IS AGREED AS FOLLOWS

- WHENEVER A 1998 BMW 7 SERIES 740iL SEDAN 4D OWNED BY PAUL THOMPSON AND ASSOCIATES, INC IS SOLD, PAUL THOMPSON WILL PAY 10% OF ALL SALES PROCEEDS OVER $9,000 TO LEWIS POLLOCK.

- SHOULD PAUL THOMPSON CONTINUE ON IN THE LIMOUSINE/AUTO FOR HIRE BUSINESS AFTER JANUARY 1, 2008, THEN POLLOCK SHALL SHARE ALL PROFITS WITH THOMPSON ON A 65% (THOMPSON) AND 35% (POLLOCK) BASIS AFTER FIRST PAYING ALL EXPENSES INCLUDING $25 PER HOUR TO THOMPSON FOR SERVICES RENDERED BY THOMPSON TO THE BUSINESS.

_Paul Thompson_
PAUL THOMPSON

_L. L. Pollock_
LEWIS POLLOCK

## PROMISSORY NOTE

APRIL 20, 2007

FOR VALUE RECEIVED,

PAUL THOMPSON AND ASSOCIATES, INC. A NEW MEXICO CORPORATION PROMISES TO PAY TO LEWIS G. POLLOCK, OR ORDER, NINE THOUSAND ($9000) DOLLARS, PAYABLE AS FOLLOWS:

- $300 PER MONTH PLUS $90 PER MONTH ALLOCATED AS FOLLOWS: COMMENCING JULY 1, 2007 $300 TO REDUCE THE ORIGINAL BALANCE OF THIS NOTE

PLUS $90 PER MONTH INTEREST UNTIL THE NOTE IS PAID IN FULL FAILURE TO MAKE MONTHLY PAYMENTS WHEN DUE, SHALL CAUSE THE ENTIRE BALANCE TO BECOME DUE AND PAYABLE THE PRINCIPAL BALANCE OF THIS NOTE MAY BE PAID AT ANY TIME WITHOUT PENALTY FOR PREPAYMENT.

THIS NOTE IS SECURED BY A LIEN ON A 1998 BMW 7 SERIES 740iL SEDAN 4D AND IS PERSONALLY GUARANTEED BY PAUL THOMPSON.

PAUL THOMPSON AND ASSOCIATES, INC.

BY _Paul Thompson_

PAUL THOMPSON, PRESIDENT, DULY AUTHORIZED

4/20/07

FOR VALUE RECEIVED, I, PAUL THOMPSON, PERSONALLY GUARANTY AND WILL PAY ON DEMAND, WITHOUT CONTRACT DEFENSES, ALL OF THE OBLIGATIONS OF PAUL THOMPSON AND ASSOCIATES, INC. TO LEWIS POLLOCK INCLUDING REASONABLE COSTS OF COLLECTION.

_Paul Thompson_

PAUL THOMPSON

Paid.

24